IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

GREGORY M. JASKOWIAK,

                      Plaintiff,             OPINION AND ORDER

     v.

                                           08-cv-579-bbc

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                   Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff Gregory Jaskowiak has had problems with decision-making and dealing with authority since childhood, manifested by poor grades and behavioral problems at school, chronic marijuana use and anger management problems. Those problems became worse in 1999, when, at the age of 17, plaintiff sustained a traumatic brain injury after falling from the hood of a moving car and striking his head on the pavement. In 2001, the Social Security Administration granted plaintiff's application for supplemental security income benefits under Title XVI of the Social Security Act, finding that he was unable to work because of his mental impairments. However, when plaintiff received a $54,000 court settlement in 2004, his benefits were terminated for excess resources. (To be eligible for supplemental security income benefits on the basis of disability, a person must not only be disabled, but also must have limited income and resources. 42 U.S.C. § 1382(a).)

Less than a year later, having spent all the money, plaintiff reapplied for supplemental security income. This time, the local disability agency denied his application. Plaintiff requested a hearing before an administrative law judge, who considered the evidence developed in connection with plaintiff's first disability application as well as more recent evidence. This included evidence that plaintiff had been employed successfully for a while as a stock clerk after his settlement money ran out, had married and was a stay-at-home father. The administrative law judge found that although plaintiff had certain mental limitations, the more recent evidence indicated that he was capable of performing unskilled work provided he had only brief and superficial contact with coworkers and supervisors and no more than minimal, incidental contact with the public. Relying on a vocational expert's testimony that a person of plaintiff's age and education with such limitations could perform a substantial number of jobs existing in the regional economy, the administrative law judge found plaintiff not disabled. This decision became the final decision of the commissioner when the Appeals Council denied plaintiff's request for review.

Plaintiff now seeks judicial review of that decision pursuant to 42 U.S.C. § 405(g). He contends primarily that the administrative law judge failed to account for evidence in the record, including some of his own findings, when he found that plaintiff was capable of performing unskilled work with limited contact with coworkers, supervisors or the public. Having carefully considered plaintiff's arguments in light of the record, the administrative law judge's decision and recent cases from the Court of Appeals for the Seventh Circuit, I

2

am persuaded that the administrative law judge properly analyzed the evidence, explained his conclusions and formulated a residual functional capacity that adequately reflected plaintiff's work abilities.  Although this is a close case that I might have decided differently were I the finder of fact, reasonable minds could find from the evidence that plaintiff's limitations, though significant, would not prevent him from performing the limited types of jobs identified by the vocational expert.  Accordingly, I am denying plaintiff's motion for summary judgment and affirming the commissioner's decision.

The following facts are drawn from the administrative record (AR):

## FACTS

### A. Background

Plaintiff was born on November 12, 1981 and was 25 years old on the date of the administrative law judge's decision.  AR 81.  Plaintiff quit high school when he was 16 but later obtained his GED.  AR 91.  As an adolescent, plaintiff was under the care of various mental health professionals for his problems with impulse control, poor grades, inability to follow rules in school and at home and verbal and aggressive behavior.  In addition, plaintiff had substance abuse problems, becoming a regular marijuana user by the time he was in eighth grade.

On July 11, 1999, plaintiff fell from the hood of a moving car and struck his head on the pavement.  He was hospitalized for four days with a diagnosis of closed head injury secondary to trauma.

B.  Medical Evidence

1.  Mark Bjerke, Ph.D.

On October 25, 2001, plaintiff was examined by Mark Bjerke, Ph.D., in conjunction with his first application for supplemental security income.  AR 244-249.  Plaintiff was a good communicator and presented as well-oriented, alert, open and positive, although he expressed a clear distaste for mental health professionals.  Bjerke noted that before the July 1999 accident, plaintiff had had anger issues, drug-related charges and behavioral problems that had eventually led to his dropping out of high school.  After the accident, plaintiff had had a 36-hour coma, loss of taste and smell, decreased IQ, language disturbance, memory problems and an exacerbation of his pre-existing personality traits.  Bjerke noted that plaintiff had been committed in February and June of 2001 for expressing a desire to kill himself.

Plaintiff told Bjerke that most of the cognitive difficulties he had experienced after the accident had resolved but that he still had personality issues and excessive ongoing marijuana use.  Although plaintiff acknowledged that he had thought about suicide in the

4

past, he denied current suicidal ideation and seemed "rather future-oriented." AR 249. He said he could not work because he had difficulty getting along with others, including supervisors, and had a hard time accepting directions. Plaintiff's parents, with whom he was living, reported that plaintiff was extremely irritable when he was not high and was often verbally abusive. They said he became quite depressed at times and cried often.

Plaintiff had a rather blunted affect and reported having panic attacks approximately every other day when he was either disputed or criticized, indicating that he felt others tended to agitate him on purpose. Although Bjerke found no clear evidence of a thought disorder, he noted that plaintiff's thought process seemed to "lack a certain degree of logic at times," AR 247, with plaintiff persistently blaming others for his distress. Bjerke estimated plaintiff's intelligence to be in the average range and found that plaintiff had the ability to complete financial calculations. From his examination, Bjerke found that plaintiff's cognitive skills including attention and memory were grossly intact, but that he had limitations in judgment and reality testing. Bjerke diagnosed cannabis dependence, depressive disorder possibly associated with a traumatic brain injury and substance abuse, social phobia and an avoidant and antisocial personality disorder. He assigned plaintiff a Global Assessment Functioning score of 50. (A score of 41-50 on the Global Assessment of Functioning (GAF) Scale indicates either serious symptoms or a serious impairment in social, occupational or school functioning. Am. Psychiatric Ass'n, Diagnostic and Statistical

5

Manual of Mental Disorders, Fourth Edition, Text Revision 34 (2000).) Bjerke noted that although plaintiff had relatively intact cognitive skills that would make him "well able" to understand, remember and carry out instructions on the job, he had serious personality and drug use issues that would stand as substantial barriers to solid working relationships with co-workers and supervisors and accepting criticism on the job. AR 244-50. Bjerke noted that plaintiff "must seek and follow through with treatment in order for psychiatric and vocational issues to be sufficiently addressed." AR 249.

2. <u>Steven Morgan, Ph.D.</u>

Steven Morgan, Ph.D., a licensed neuropsychologist, evaluated plaintiff on August 4, 2003 in connection with a personal injury suit filed by plaintiff related to the accident. AR 267-279. Plaintiff reported that he did not feel as "smart" or "quick" as he had before the accident and had continuing problems with anger control and memory. Plaintiff's father said it was as if the accident had arrested plaintiff's development, stating that his son still acted as if he were 17.

Morgan conducted an extensive review of plaintiff's academic, medical and psychiatric history both before and after the accident, interviewed plaintiff and his father and administered several tests. Test results revealed a mild degree of memory impairment but no other significant cognitive deficits, with plaintiff's IQ scores in the upper portion of the

average range.  Plaintiff had average or better scores on tests of his complex attentional functions, higher level conceptual reasoning and processing speed.  His responses on the MMPI-2, however, suggested "depressive symptomatology in the context of probably longstanding personality features characterized by rebelliousness, unconventional behavior, and difficulty dealing with authority figures."  AR 277.  Overall, Morgan concluded, plaintiff's head injury had likely exacerbated his pre-existing personality features of low frustration tolerance, impulsivity and lack of drive, which might be heightened by depression. Nonetheless, Morgan stated, he "would not presume [plaintiff] to be disabled" in the absence of more aggressive psychiatric and rehabilitation therapies, noting that plaintiff's neuropsychological deficits were "very circumscribed and mild."  AR 279.

At a deposition, Morgan testified that he had not seen plaintiff's social security record and did not know why plaintiff had been found disabled.  Morgan testified that, in his experience, psychologists who perform disability evaluations for the social security administration typically lack specific training and expertise in evaluating brain injuries and generally base their opinions in such cases on the claimant's self-reports.  AR 326.  According to Morgan, there were certain interventions that should have been pursued before plaintiff was "stamped as disabled," such as residential programs that specialize in treating patients with brain injuries, vocational rehabilitation and psychological support.  AR 327.

3.  Dr. Jeffrey Cameron

Dr. Jeffrey Cameron, a physical medicine and rehabilitation specialist, testified at a deposition on September 22, 2003.  Cameron testified that he had conducted a one-hour interview of plaintiff and his father and had reviewed plaintiff's medical records.   In Cameron's opinion, plaintiff's reported impulsivity, lack of motivation, difficulty making good decisions and problems with irritability and anger control were consistent with someone who had sustained a frontal lobe injury and would pose difficulties in plaintiff's ability to hold a job.   Cameron indicated that plaintiff might benefit from counseling with a psychologist and possibly medication trials that could help him control his anger and acting out.  He also testified that daily marijuana use could cause problems with memory, attention and concentration.  AR 287-89.


4.  Minette Ponick, Ph.D.

Minette Ponick, Ph. D., testified at a deposition on October 6, 2003.  Ponick, a licensed psychologist, had seen plaintiff on several occasions as a teenager for his behavioral problems.  Ponick saw plaintiff shortly after his accident, at which time she noted that plaintiff was sullen, unkempt, had skewed insight and barely spoke, which was a drastic change from his demeanor and personality before the accident. AR 307.  She saw him again

in September 2003.  According to Ponick, plaintiff showed a profound lack of hopelessness

and frustration, which she attributed to his difficulties with concentration and information

retrieval.  In Ponick's view, plaintiff lacked the survival skills necessary for him to cope on

his own.  AR 308.

5.  Richard E. Fuhrer, Ph. D.

On  June  6,  2005,  psychologist  Richard  E.  Fuhrer  performed  a  consultative

examination of plaintiff for the state disability agency in connection with plaintiff's 2005

application for supplemental security income.  AR 348-354.  Plaintiff said that he could not

work because he could not get along with people and did not like to be told what to do.  He

added that after the accident, his attorney told him not to work because it might interfere

with his court case.  He reported that, when he received a settlement of $54,000 in March

2004, he did not need to work.  He stated that he "blew the money" against the advice of

his parents and girlfriend, but that if he had to do it over again, he would not do it any

differently.  Plaintiff stated that he would like to have a job, but only so that he could have

some income.  He had not had any psychiatric care for approximately two years and took no

medication.  Plaintiff reported smoking marijuana daily when he has it.

On examination, Fuhrer noted that plaintiff had an unkempt appearance and a

distinctive body odor, with plaintiff's girlfriend reporting that he showered about once a

week.  Plaintiff had excellent receptive and expressive communication skills, showed no obvious anxiety and was cooperative during the interview, although he become somewhat irritable at the end when his girlfriend provided information.  Plaintiff's mood was "generally euthymic" and he was cheerful through most of the interview.  Plaintiff reported that although he occasionally became anxious, his anxiety was no longer as significant a problem as it had been in the past.  Plaintiff's girlfriend indicated that plaintiff had bad days about twice a month when he seemed quite anxious.  Plaintiff scored zero on the Beck Depression Inventory and did not complain of any disturbances of sleep, appetite, energy, sense of worthlessness or social withdrawal.  Regarding plaintiff's social functioning, Fuhrer noted that plaintiff socialized with friends.  He had temper tantrums about twice a month and showed poor social judgment, becoming quite angry at others and tending to be somewhat impulsive.

Fuhrer found no significant evidence of depression.  He indicated that during the interview, plaintiff's cognitive functioning appeared to be "rather good" and he had an average ability to reason and maintain attention and concentration on tasks presented to him.  Fuhrer noted that plaintiff's long-term memory was poor and that plaintiff said he had a fairly good memory for numbers, but not for events.  In addition, he noted that although plaintiff's girlfriend complained about his reasoning abilities, "it appears that this is more a

rigidity involving him tenaciously holding to a point of view . . . rather than an underlying problem with reasoning per se."  AR 353.

Assessing plaintiff's work capacity, Fuhrer concluded that plaintiff was able to understand, remember and carry out simple instructions, noting that plaintiff's primary difficulties were "personality" or "attitude" rather than cognitive dysfunction.  He thought that plaintiff's ability to respond to his supervisors was likely to be poor primarily because of his hostile attitude toward authority. Fuhrer indicated that plaintiff's ability to maintain concentration, attention and work pace was "somewhat impaired," his ability to withstand work stress "may" be impaired and he was likely to be able to adapt to changes.  Fuhrer gave plaintiff a score of 55 on the Global Assessment Functioning scale, indicating moderate symptoms.  AR 353-54.

6.  State agency non-examining psychologists

On June 16, 2005, state agency consulting psychologist Eric M. Edelman completed a Psychiatric Review Technique Form for plaintiff, evaluating the evidence under the listing categories for organic mental disorder, affective disorder, personality disorder and substance addiction disorder.  In addressing the "B" criteria for these listings, he found plaintiff had mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no

episodes of decompensation.  Edelman concluded that the evidence did not establish the presence of the "C" criteria.  AR 371-81.

Edelman also completed a Mental Residual Functional Capacity Assessment form (Form SSA-4734-F4-SUP) for plaintiff.  On the "summary conclusions" section of the form, he checked boxes indicating that plaintiff was moderately limited in the following areas:

- understanding, remembering and carrying out detailed instructions;

- maintaining attention and concentration for extended periods;

- working in coordination with or proximity to others without being distracted by them;

- completing a normal work day and work week without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods;

- accepting instructions and responding appropriately to criticism from supervisors;

- getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; and

- maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness.

He also found that plaintiff was markedly limited in his ability to interact appropriately with the general public.  AR 367-69.  On September 26, 2005, state agency consulting psychologist Keith Bauer affirmed Edelman's assessment.  AR 369, 371.

12

7. <u>Jason E. Kanz, Ph.D.</u>

On April 2, 2007, Jason E. Kanz, Ph.D., performed a neuropsychological evaluation of plaintiff. AR 426-431. Kanz interviewed plaintiff and his mother, reviewed available medical records and administered a battery of neuropsychological tests. Plaintiff and his mother reported that plaintiff had problems with memory, word finding, distractibility, processing speed and impulsivity, as well as "anger issues." Plaintiff had a nine-month-old daughter and, according to his mother, often yelled at her and expected her to be "reasonable."

Plaintiff appeared for the interview appropriately dressed and groomed and his mood and speech were normal. He described his mood as "stormy," noting that he often became anxious, particularly if his wife was gone longer than she said she would be. Plaintiff was not working but had held a few jobs in the past. He indicated that he had been hospitalized three or four times in the past for suicidal ideation but had not felt suicidal recently. He slept well and his appetite was fine. He reported that he and his wife had been together for four years and got along well. He said he smoked marijuana once or twice a day.

On testing, plaintiff's processing speed was mildly slowed. Plaintiff's full scale IQ was 120. Test results showed that plaintiff had "superior" intellectual skills and executive functioning and his memory was consistently intact. Plaintiff's scores on a personality assessment fit the profile of someone who was easily provoked and might show explosive

13

anger when frustrated.   From the test results, historical information and behavioral observations, Kanz concluded that plaintiff had a "classic orbitofrontal syndrome."  AR 430. Kanz explained that typically, "individuals with this profile perform normally on cognitive testing, though manifest significant changes in behavior and personality as was endorsed by [plaintiff] and his mother."  Id.  He noted that plaintiff's reported disinhibition, combined with irritability and aggressiveness, was consistent with damage to the orbitofrontal cortex. Kanz indicated that these symptoms were "likely exacerbated by stress," noting that plaintiff's recently having become a husband and father was a source of significant stress. Id.  Kanz recommended that plaintiff take parenting classes, engage in stress reduction activities and use written reminders to help him remember how to respond in certain situations.  In addition, he strongly recommended that plaintiff stop using marijuana, which could be having an "acute effect" on plaintiff's concentration and memory.  AR 431.

## C.  Hearing Testimony

### 1.  Plaintiff

Plaintiff testified that he obtained his GED after the accident.  From October 2005 to January 2006, he worked as a stock clerk at T. J. Maxx.  Plaintiff testified that when he started, he worked between 30 and 35 hours a week, but his employer later cut his hours down to seven a week so he quit.  AR 451.  Plaintiff said he had not had time to look for

another job because he spent most of his time taking care of his one-year-old daughter.  AR 452.

Plaintiff testified that he smoked marijuana two to three times a week.  AR 455.  He played frisbee golf, watched movies and grilled out with his friends.  He did not have a driver's license by choice and took no medications.   AR 455.  He took care of his daughter, made dinner and did most of the housework while his wife was at work.  He went to the grocery store on occasion.

When asked why he thought he could not work, plaintiff replied that he did not get along with most people, including his family.  AR 457-58.  He explained that his opinion "clashes with other people and then I get defensive," which led to arguments.  AR 457.  He said that he did not get in arguments too often when he worked at T.J. Maxx because he worked mostly in the back room and did not have much contact with other people.  He did not get in any arguments with any supervisors.  AR 458.  When asked whether he thought he could perform the job he had had at T.J. Maxx on a full time basis, he said he probably could do so.  AR 457.  Plaintiff testified that he did not handle stress well, giving an example of how he blew up at his wife when her car broke down and she got home two or three hours late.  AR 460.

He testified that he had received $54,000 as a personal injury settlement from his accident and spent it on traveling, rent, marijuana and things for his house.  He had traveled

to California and Canada with his wife.  AR 461.  He said it did not occur to him until the money was almost gone that he ought to save some of it.  Plaintiff said his ability to control his impulses or anger was no better than it had been when he was found disabled in 2001.  AR 463.

2.  Vocational expert

The administrative law judge called Karl Botterbusch to testify as a neutral vocational expert.  AR 465.  He asked Botterbusch to assume an individual of plaintiff's age and education, who was limited to unskilled work with brief and superficial contact with coworkers and supervisors, minimal contact with the public (only one-sixth of the work day or less) and no responsibility for direct customer service.  Botterbusch responded that this individual would be able to perform jobs as commercial or institutional cleaner (51,000 jobs in Wisconsin), stores laborer (16,000 jobs in Wisconsin) and farm worker (970 jobs in Wisconsin).  The administrative law judge then asked the expert whether the individual could work if he could have no contact with supervisors and would miss three days of work a month.  The expert responded that such an individual would not be able to work.  He stated that his testimony was consistent with the information in the Dictionary of Occupational Titles.  AR 465-67.

Plaintiff's lawyer attempted to ask Botterbusch whether an individual who had the various moderate and marked limitations endorsed by the state agency physicians on the "Summary Conclusions" portion of the Mental Residual Functional Capacity Assessment form would be able to work competitively, but the administrative law judge ruled that the question was too vague. AR 468-69. The administrative law judge explained that the form was just a "check sheet" used by the non-examining state agency evaluator that did not express the claimant's residual functional capacity in terms of specific work-related limitations. AR 468. Taking a different tack, plaintiff's attorney asked Botterbusch whether, in order for an individual to perform the jobs he had identified in response to the administrative law judge's hypothetical, the person was required to possess each of the abilities in which the state agency psychologist had found plaintiff to have moderate or greater limitations. Botterbusch responded, "Yes."

## D. <u>The Administrative Law Judge's Decision</u>

In reaching his conclusion that plaintiff was not disabled, the administrative law judge performed the required five-step analysis. 20 C.F.R. § 416.920. Under this test, the administrative law judge considers sequentially 1) whether the claimant is currently employed, 2) whether the claimant has a severe impairment, 3) whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. § 404, Subpt. P, App.

1, 4) whether the claimant can perform his past work and 5) whether the claimant is capable of performing work in the national economy.  Knight v. Chater, 55 F.3d 309, 313 (7th Cir. 1995).  If a claimant satisfies steps one through three, he is found automatically to be disabled.  If the claimant meets steps one and two, but not three, then he must satisfy step four.  Id.  The claimant bears the burden of proof in steps one through four.  If the claimant satisfies step four, the burden shifts to the commissioner to prove that the claimant is capable of performing work in the national economy.  Id.

At step one, the administrative law judge found that plaintiff had not engaged in substantial gainful activity since April 13, 2005, his application date.  AR 27.  At step two, he found that plaintiff had severe impairments of a traumatic brain injury, a history of closed head injury with subdural hematoma, alcohol and cannabis dependencies, a mood disorder and a personality disorder.  AR 27.  Because he found that plaintiff had a mental impairment, the administrative law judge proceeded to consider the "paragraph B" criteria of the listings for mental impairments, assessing plaintiff's activities of daily living; social functioning; concentration, persistence and pace; and frequency and duration of any episodes of decompensation.  20 C.F.R. § 416.920(b) (explaining technique for evaluating mental impairments).  He found that plaintiff had only a mild restriction in his activities of daily living, noting that plaintiff was a stay-at-home dad who was able to cook, clean, shop, care for his child, spend time with friends and play frisbee golf.  With respect to social

18

functioning, the administrative law judge found plaintiff to have moderate difficulties.  He noted that plaintiff had had arguments with his parents, had a hostile attitude towards authority, had been noted to have poor hygiene and had been committed several times because authorities thought he was a danger to himself.  On the other hand, plaintiff reported that he got along well with his wife and shopped on a regular basis, which indicated that he was able to go out in public "and tolerate at least superficial interactions with others."  AR 28.

The administrative law judge found that although plaintiff and his father had reported that plaintiff had problems with memory, overall, plaintiff had only moderate limitations with regard to concentration, persistence or pace.  He noted that Bjerke had observed that plaintiff had the ability to complete financial calculations; Fuhrer found in June 2005 that plaintiff was able to understand, remember and carry out simple instructions and had a good memory for numbers, but not events; plaintiff's post-injury IQ scores were in the average category; and Kanz had found in March 2007 that plaintiff had a normal attention span and recall ability.  Finally, the administrative law judge found that plaintiff had experienced no episodes of decompensation, noting that although plaintiff had been hospitalized for mental problems, the stays were brief and did not meet the SSA's definition of an episode of decompensation.  AR 29.

Explaining that the "paragraph B" criteria were not a residual functional capacity assessment but were used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process, the administrative law judge proceeded to "translate" his paragraph "B" findings into work-related functions in his assessment of plaintiff's residual functional capacity.  Id.  The administrative law judge determined that plaintiff retained the residual functional capacity to perform unskilled work activity that required no more than brief and superficial contact with coworkers and supervisors and no more than minimal, incidental interaction with the public.  AR 30.  In making this assessment, he noted that much of the evidence predated plaintiff's current application for benefits by many years.  He explained that although he had considered this evidence, the more recent evidence was more relevant to assessing plaintiff's current impairments and their impact on his ability to work. He explained that he had considered Bjerke's opinion that plaintiff's personality and drug issues would stand as substantial barriers to forming solid working relationships with supervisors and coworkers.  In the administrative law judge's view, Bjerke's statements did not mean that plaintiff was unable to work, but rather that he was "likely to have difficulty with supervisors and coworkers."  AR 30.  The administrative law judge indicated that he had included a limitation on interaction with coworkers, supervisors and the general public on the basis of Bjerke's opinion.

20

The administrative law judge also considered Fuhrer's June 2005 report, noting his opinion that plaintiff likely had a poor ability to relate to supervisors and was impaired in his ability to maintain concentration, attention and work place pace and withstand routine work stress.  As with Bjerke's statements, the administrative law judge interpreted Fuhrer's statements to mean not that plaintiff would be unable to perform these activities, but rather that he would have difficulty doing them.  The administrative law judge found that, when considered in its entirety, the record supported "no more than moderate limitations in these areas."  Id.  He explained:  "Based in part on Dr. Fuhrer's opinion, the undersigned [is] including limitations in the residual functional capacity including a restriction to unskilled work and a limitation on his interactions with others, including supervisors."  Id.  He also explained that he had given "significant weight" to Kanz's report and his opinion that plaintiff's symptoms were exacerbated by stress, and had included a limitation to unskilled work to account for it.

The administrative law judge found that although plaintiff's medically determinable impairments could reasonably be expected to produce plaintiff's alleged symptoms, plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible.  AR 32.  The administrative law judge considered plaintiff's activities of daily living, finding plaintiff's activity level to be inconsistent with his allegations of disability.  In addition, he noted that plaintiff had not had any psychiatric care since

21

approximately 2003, had worked briefly as a stock clerk and had left the job only because his hours were reduced but otherwise would have been able to perform the job full time and had responsibilities at home that provided a disincentive for him returning to the work force.

Finally, the administrative law judge noted that plaintiff had been found disabled on the basis of a prior application and that his benefits had been terminated for excess resources, not a finding that plaintiff was no longer disabled.  He noted, however, that Morgan had testified that psychologists who evaluated brain injuries for disability "rarely have applicable experience" and that there were interventions that should have been pursued before plaintiff was "stamped as disabled."  AR 31.

At step four, the administrative law judge found plaintiff had no past relevant work experience.  AR 32.  At step five, the administrative law judge found that plaintiff was not able to perform his past work but could perform a significant number of other jobs in the economy, namely farm worker (970 jobs), cleaner (51,000 jobs) and store laborer (16,000 jobs).  In reaching this conclusion, the judge relied on the testimony of the vocational expert, finding it to be consistent with the Dictionary of Occupational Titles.  AR 19.

OPINION

A. <u>Standard of Review</u>

The standard by which a federal court reviews a final decision by the commissioner is well settled: the commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence."  42 U.S.C. § 405(g).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971).  When reviewing the commissioner's findings under § 405(g), the court cannot reconsider facts, reweigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the administrative law judge regarding what the outcome should be.  <u>Clifford v. Apfel</u>, 227 F.3d 863, 869 (7th Cir. 2000).  Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the commissioner.  <u>Edwards v. Sullivan</u>, 985 F.2d 334, 336 (7th Cir. 1993).  Nevertheless, the court must conduct a "critical review of the evidence" before affirming the commissioner's decision, <u>id.</u>, and the decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review."  <u>Steele v. Barnhart</u>, 290 F.3d 936, 940 (7th Cir. 2002).  When the administrative law judge denies benefits, he must build a logical and accurate bridge from the evidence to his conclusion.  <u>Zurawski v. Halter</u>, 245 F.3d 881, 887 (7th Cir. 2001).

23

### B.   Residual Functional Capacity

This case is primarily about the administrative law judge's determination of plaintiff's residual functional capacity, or RFC.  A claimant's "residual functional capacity" is the "individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis."  Social Security Ruling 96-8p; see also 20 C.F.R. § 416.645; Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004) ("The RFC is an assessment of what work-related activities the claimant can perform despite her limitations.").  A "regular and continuing basis" means "8 hours a day, for 5 days a week, or an equivalent work schedule."  Id.  The RFC assessment takes into account both exertional limitations, that is, limitations on the ability to sit, stand, walk, lift, carry, push and pull, and non-exertional limitations, which include postural, manipulative, environmental and mental limitations.  Id.   With respect to mental limitations, the regulation explains that "[w]ork-related mental activities generally required by competitive, remunerative work include the abilities to:  understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting."  Id.; see also SSR 85-16, 85-15.  When assessing exertional limitations, the administrative law judge first must determine the claimant's ability to sit, stand, walk, lift, carry, push and pull before assigning an exertional category, e.g., sedentary, light, medium, heavy.  Id.  However, SSR 96-8p contains no similar

directive regarding the manner in which an administrative law judge may translate mental RFC into categories, or otherwise express it in shorthand fashion. Id.

In considering a claimant's RFC, an administrative law judge is expected to take into consideration all relevant evidence, both medical and non-medical, including a claimant's own statement of what he or she is able or unable to do. 20 C.F.R. § 416.945(a)(3). Although medical evidence is certainly important, "[t]he determination of RFC . . . is an issue reserved to the SSA," and an administrative law judge need not consider a medical opinion conclusive. Diaz v. Chater, 55 F.3d 300, 306 n.2 (7th Cir. 1995) (citing 20 C.F.R. §§ 404.1527(e)(2) & 416.927(e)(2)). As with his other findings, the administrative law judge must provide a "narrative discussion" describing how the evidence supports his conclusions. SSR 96-8p.

As indicated above, the administrative law judge in this case determined that plaintiff had the residual functional capacity to perform unskilled work, provided he had no more than brief and superficial contact with coworkers and supervisors, no more than minimal (not more than one-sixth of a work day) interaction with the public, and that any contact with the public was incidental in nature. Plaintiff wages two primary challenges to the administrative law judge's RFC assessment. First, he argues that the administrative law judge "ignored" several pieces of evidence indicating that plaintiff has more significant limitations and failed to properly evaluate plaintiff's credibility. Second, he argues that the

25

administrative law judge failed to account for his own findings that plaintiff had moderate limitations in concentration, persistence or pace and in dealing with workplace stress.

1. Evaluation of the evidence

Plaintiff argues that the administrative law judge's residual functional capacity assessment fails to account for 1) his GAF scores of 50 and 55, as found by Bjerke and Fuhrer, respectively; 2) Morgan's opinion that plaintiff has mild memory inefficiency, low frustration tolerance, impulsivity and lack of drive; 3) evidence pertaining to plaintiff's two inpatient hospitalizations in 2001; 4) Cameron's opinion that plaintiff had diminished ability to reason and make good decisions and a lack of motivation and impulse control; 5) Ponick's opinion that plaintiff had profound hopelessness and diminished frustration tolerance; and 6) the opinion of Edelman, the state agency physician, who completed a mental residual functional capacity form on which he endorsed a number of "moderate" limitations, including limitations on plaintiff's ability to maintain attention and concentration for extended periods.  (Plaintiff also argues that he has a non-severe back impairment that the administrative law judge should have considered in determining his residual functional capacity.  I do not consider this argument because plaintiff points to no evidence that his back impairment limits his ability to perform work-related functions.)  In

addition, plaintiff contends that the administrative law judge did not provide good reasons for discounting his subjective complaints.

It is well-settled that an administrative law judge need not address every piece of evidence in writing, so long as he does not ignore an "entire line" of evidence. Golembiewski v. Barnhart, 322 F.3d 912, 917 (7th Cir. 2003). The administrative law judge did not do that here. First, much of the evidence that plaintiff accuses the administrative law judge of ignoring predated the relevant time period by several years. In his decision, the administrative law judge acknowledged this evidence and stated that he had considered it, but reasonably found that it was entitled to less weight than the more recent evidence concerning plaintiff's functional abilities. Diaz v. Chater, 55 F.3d 300, 309 (7th Cir. 1995) (administrative law judge reasonably could afford little weight to worker's compensation award finding plaintiff had limited use of hands when evidence of "more recent vintage" showed few limitations); Dotson v. Peabody Coal Co., 846 F.2d 1134, 1139 (7th Cir. 1988) ("an ALJ may permissibly accord greatest weight to the most recent medical evidence").

Second, none of this evidence establishes that plaintiff is disabled or has greater limitations than found by the administrative law judge. The GAF scores, which measure a "clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision 32 (2000), are intended to be used to make treatment decisions, id., not as a measure of the

27

extent of an individual's disability.  Although a GAF score may provide a perspective on a claimant's level of functioning, nothing in the social security regulations or case law requires an administrative law judge to factor the score into his decision.  Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002) (GAF score may assist administrative law judge in formulating claimant's RFC but is not essential).  In any case, plaintiff's GAF scores are not inconsistent with the administrative law judge's RFC determination that plaintiff has significant mental limitations.

Contrary to plaintiff's contention, the administrative law judge discussed the opinions of Morgan and Cameron.  Plaintiff argues that the administrative law judge "ignored" their findings that he had problems with impulsivity, decision-making and motivation as a result of his accident, and further contends that these findings show that he could not have "even minimal interaction" with others on a full time basis.  Plt.'s Reply Mem., dkt. #11, at 7.  I disagree.  As the administrative law judge noted, Morgan said that he would not presume plaintiff to be disabled, at least not in the absence of rehabilitation, and Cameron had also indicated that with treatment, plaintiff might be able to attain better impulse control and learn strategies to overcome his memory limitations.  From these statements, the administrative law judge reasonably found that in spite of finding that plaintiff had significant mental limitations, neither doctor was of the opinion that the limitations would necessarily preclude plaintiff from employment.  Further, as the administrative law judge

28

noted, Morgan and Cameron's opinions were rendered several years before the relevant time period. As a result, they were less relevant to assessing plaintiff's limitations than more recent evidence, including the June 2005 evaluation by Fuhrer, the April 2007 evaluation by Kanz and plaintiff's successful work attempt.

Plaintiff argues that the administrative law judge should have afforded no weight to Morgan's opinion regarding disability because Morgan admitted that he did not perform Social Security disability evaluations and because administrative law judges, not doctors, are responsible for the ultimate determination of disability. 20 C.F.R. § 416.927(e). Although it is true that an administrative law judge need not accept a medical source's opinion that a claimant is or is not disabled, he is not precluded from considering such statements. It was reasonable for the administrative law judge to look to Morgan's statement to help clarify the extent to which plaintiff's problems with impulsivity and decision-making would interfere with his ability to work.

The administrative law judge also acknowledged plaintiff's inpatient hospitalizations, mentioning them several times in his decision. AR 28 (noting plaintiff had an argument with his parents that required police intervention and hospitalization and had several commitments when it seemed he was a danger to himself) and 29 (noting that plaintiff had had short-term hospitalizations). However, at the time of the hearing six years later, there was no evidence that plaintiff had had any recent hospitalizations or threatened suicide, as

29

he had in the past, and plaintiff did not endorse any symptoms of depression.  Accordingly, the administrative law judge did not error in failing to devote more discussion to this evidence.

I also find no error in the administrative law judge's failure to discuss the deposition testimony of Ponick, the licensed psychologist who had treated plaintiff as an adolescent and who saw him on two occasions after his accident.  Although Ponick painted a bleak picture of plaintiff's post-accident condition, she did not offer any direct assessment of plaintiff's ability to work or propose any work-related limitations.  Moreover, the more recent evidence indicated that plaintiff was far less impaired than Ponick's testimony suggested.  The administrative law judge reasonably gave the more recent evidence more weight than Ponick's October 2003 deposition.

With respect to the various moderate and marked limitations endorsed by the state agency psychologists, plaintiff argues that the vocational expert testified that an individual with such limitations would be incapable of performing any work.  This is an improper misstatement of the record.  The vocational expert testified merely that, to be employed competitively, a person would have to be able to perform each of the various work-related functions itemized on the "summary conclusions" portion of the mental residual functional capacity form completed by the state agency psychologists.  Contrary to plaintiff's assertion, the expert was not asked whether a person who was "moderately limited" in several of those

30

functions and "markedly limited" in his ability to interact with the public could work. Accordingly, the state agency psychologists' opinions do not establish that plaintiff is disabled.   Further, nothing in the commissioner's regulations or rulings requires administrative law judges to make findings concerning each of the limitations listed on the "Summary Conclusions" or to use the same terminology to express the degree to which the plaintiff is limited.   Dunn v. Astrue, 563 F. Supp. 2d 950, 959 (W.D. Wis. 2008) (citing Lembke v. Barnhart, 2006 U.S. Dist. LEXIS 95154, *24-27 (W.D. Wis. Dec. 29, 2006)).

As for plaintiff's subjective complaints, plaintiff argues that the administrative law judge drew illogical conclusions from the evidence in concluding that plaintiff's allegations of total disability were not entirely credible.  To recap, the administrative law judge cited as support for his credibility assessment plaintiff's varied daily activities, lack of psychiatric care, marijuana use, reasons for not working and testimony that he was capable of working full time as a stock clerk.  Plaintiff attacks each of these findings, arguing that none of his various daily activities show that he is able to deal with others in the workplace; his failure to seek mental health treatment is the result of his condition and in any case, would not help because his brain injury is permanent; Kanz's statement that plaintiff's concentration and memory would improve if he stopped smoking marijuana was just a "guess;" and that he was able to perform his job at T.J. Maxx only because of significant accommodations from his employer.

31

These arguments are not persuasive.  Although it is true that a claimant's work-at-home activities do not necessarily show that he can meet the demands of the workplace or deal with others, the administrative law judge could reasonably conclude that plaintiff's ability to maintain a relationship with his wife, cook, clean, care for a child, see friends on occasion and grocery shop showed a relatively high degree of functioning and the ability to tolerate some interactions with others.  Furthermore, it was not unreasonable for the administrative law judge to view plaintiff's responsibilities as a stay-at-home father as a reason to question plaintiff's motivation for seeking disability benefits instead of a job.

With respect to plaintiff's course of medical treatment, nothing in the record suggests that psychiatric treatment would not be effective in reducing plaintiff's irritability, impulse control and reactions to stress, notwithstanding the fact that plaintiff's brain injury is permanent.  In fact, nearly everyone who evaluated plaintiff thought he would benefit from treatment.  Furthermore, plaintiff's course of treatment was significant in that it tended to show that plaintiff was functioning better than he had been in the years immediately after his accident.  Whereas the record in 2001 included evidence of recent hospitalizations for suicidal ideation, plaintiff had had no hospitalizations or any psychiatric care in the several years preceding his 2005 application.  Finally, plaintiff's last two arguments—that Kanz was merely guessing when he predicted that plaintiff's memory would improve if he stopped smoking marijuana and that plaintiff was given special accommodations at T.J. Maxx—have

not one shred of support in the record.  Overall, plaintiff has failed to show that the administrative law judge ignored any significant evidence or that his assessment of plaintiff's credibility was patently wrong.  Prochaska v. Barnhart, 454 F.3d 731, 738 (7th Cir. 2006) (administrative law judge's credibility determination will be upheld unless it is "patently wrong").

In sum, although the nature of plaintiff's mental impairments may be no different than they were in 2001, the record reasonably supports the conclusion that plaintiff's functional limitations from those impairments are less severe than they were in 2001. Perhaps the agency overestimated plaintiff's limitations the first time, or perhaps plaintiff has developed strategies to compensate for them.  Whatever the case, I am satisfied that the administrative law judge properly evaluated the evidence before him and properly determined that during the time period under consideration, plaintiff had at most moderate functional limitations resulting from his impairments.


2.  Law regarding mental residual functional capacity assessments

Plaintiff contends that, even assuming the administrative law judge properly evaluated the evidence, the manner in which the administrative law judge phrased his residual functional capacity assessment and corresponding hypothetical to the vocational expert were flawed because they did not account for the administrative law judge's findings that plaintiff

33

has moderate limitations in concentration, attention and pace and the ability to withstand stress.  Plaintiff argues that it was not enough for the administrative law judge to have accounted for these limitations by restricting plaintiff to "unskilled" work.  Instead, argues plaintiff, the administrative law judge should have included *additional* limitations on concentration, persistence and pace and ability to withstand stress.

Just how an administrative law judge must account for mental limitations in a hypothetical to the vocational expert, which typically tracks the RFC assessment, is an issue that arises frequently in social security disability appeals.  In Kusilek v. Barnhart, 04-C-310-C, the commissioner argued that the administrative law judge had adequately accounted for plaintiff's mental limitations by limiting her to unskilled or simple semi-skilled work, pointing out that the state agency psychologist, while finding that plaintiff had various moderate limitations in her work abilities, had also indicated that plaintiff was capable of "low stress routine work."  In a report and recommendation adopted by this court, United States Magistrate Judge Stephen Crocker rejected this argument, noting that the administrative law judge had indicated that he was giving little weight to the state agency psychologist's opinion and, in any case, did not find that plaintiff could perform "low stress routine work" but rather that she could perform unskilled or simple semi-skilled work, which the administrative law judge indicated were jobs with a Specific Vocational Preparation (SVP) of no more than 3 or 4.  Rep. and Rec., dkt. #12, at 27 & n.2 (noting that jobs with

34

SVP of 3 or 4 can be learned within time period of one month to six months).  The magistrate judge was not persuaded that the terms were equivalent, noting that even simple, easy-to-learn jobs could be stressful, such as jobs involving high production quotas or those involving significant contact with the public.  Id.  He also found that it was unclear how the administrative law judge had translated his own finding that plaintiff suffered from moderate deficiencies of concentration, persistence or pace into an assumption that plaintiff could perform jobs with an SVP of 3 or 4.  Id. at 29.

In opposition to plaintiff's subsequent petition for attorney fees under the Equal Access to Justice Act, the commissioner argued that she had been substantially justified in defending the hypothetical.  I agreed, concluding from a review of the case law that "there does not appear to be a consensus among the circuits or within the Seventh Circuit regarding whether it is proper for an administrative law judge to phrase his mental residual functional capacity and corresponding hypothetical in terms of the work a plaintiff can perform, for example, 'simple, unskilled, low stress work,' as opposed to simply setting forth plaintiff's limitations and allowing the vocational expert to conclude on his own what types of work plaintiff can perform."  Mar. 2, 2005 Opin. and Order, dkt. #24, at 8.  In addition, I found that it was not unreasonable for the commissioner to have argued that, in limiting plaintiff to simple, easy-to-learn jobs, the administrative law judge was *de facto* limiting plaintiff to the low stress, routine work recommended by the state agency psychologist.  Id. at 9.

35

The court of appeals upheld this decision, agreeing that there was "uncertainty in the law regarding the formulation of hypothetical questions accounting for mental limitations." Kusilek v. Barnhart, 175 Fed. Appx. 68, 71 (7th Cir. April 4, 2006) (non-precedential disposition).  On the one hand, noted the court, it had reversed and remanded cases "where an ALJ framed a plaintiff's mental limitations in terms of the type of work she could perform (e.g., semi-skilled, routine work) instead of in terms of her specific limitations (e.g., deficiencies in concentration)." Id. at 70-71(citing Young v. Barnhart, 362 F.3d 995, 1002 (7th Cir. 2004) (ALJ's hypothetical limiting plaintiff to "simple, routine, repetitive, low stress work with limited contact with coworkers and public" was flawed because it did not account for medical opinion suggesting that plaintiff had difficulty taking instructions and responding appropriately to criticism) and Kasarsky v. Barnhart, 335 F.3d 539, 544 (7th Cir. 2003)(ALJ's hypothetical inquiring about available work for a plaintiff who "[b]ecause of borderline intelligence . . . is seriously limited, but not precluded from understanding, remembering, and carrying out detailed instructions" was flawed because it failed to account for plaintiff's "frequent deficiencies of concentration, persistence, or pace")).  In contrast, noted the court, in several other cases it had upheld administrative law judges' findings that plaintiffs with mental limitations could perform "simple" or "semiskilled" work.  Id. at 71 (citing Jens v. Barnhart, 347 F.3d 209, 212-13 (7th Cir. 2003) (plaintiff capable of semiskilled work even though he "often" had "deficiencies of concentration, persistence or

pace"), <u>Sims v. Barnhart</u>, 309 F.3d 424, 431 (7th Cir. 2002) (court approved ALJ's finding that plaintiff retained RFC to perform "simple and repetitive light work" even though ALJ found plaintiff "mildly to moderately limited" in her ability to maintain "concentration, persistence, and pace") and <u>Johansen v. Barnhart</u>, 314 F.3d 283, 288-89 (7th Cir. 2002) (deeming acceptable RFC assessment finding that plaintiff could perform "repetitive, low-stress work" although he had "moderate" mental limitations). <u>See also</u> <u>Howard v. Massanari</u>, 255 F.3d 577, 582 (8th Cir. 2001) ("ALJ's hypothetical concerning someone who is capable of doing simple, repetitive, routine tasks adequately captures [plaintiff's] deficiencies in concentration, persistence or pace") and <u>Smith v. Halter</u>, 307 F.3d 377, 378-79 (6th Cir. 2001) (hypothetical limiting plaintiff to jobs that are "routine and low stress" adequately accounted for plaintiff's " 'often' . . . deficiencies in concentration, persistence, or pace"), cited in <u>Kusilek</u>, 175 Fed. Appx. at 71.  Accordingly, the court upheld this court's determination that the commissioner had been substantially justified in defending the adequacy of the RFC assessment.

In a recent decision, however, a *per curiam* panel of the Court of Appeals for the Seventh Circuit took a starkly different view of the case law.  In <u>Stewart v. Astrue</u>, 561 F.3d 679, 685 (7th Cir. 2009), the court found that the commissioner was *not* substantially justified in arguing that the administrative law judge had accounted for the plaintiff's moderate limitations in concentration, persistence and pace by posing a hypothetical that

37

asked the vocational expert to assume a person who was limited to simple, routine tasks not requiring constant interactions with coworkers or the general public.  Citing its decisions in Young, Kasarsky, and more recently, Craft v. Astrue, 539 F.3d 668, 677-78 (7th Cir. 2008), as well as cases from the Third and Sixth Circuits, the court found that the administrative law judge had violated a "clear line of precedent" when he purported to account for the plaintiff's moderate deficiencies in concentration, persistence and pace by restricting her to simple, routine tasks that did not require constant interactions with coworkers or the general public.  Id.  The court saw little room for debate on this question, declaring: "The Commissioner continues to defend the ALJ's attempt to account for mental impairments by restricting the hypothetical to 'simple' tasks, and we and our sister courts continue to reject the Commissioner's position."  Id.  Noticeably absent from the court's discussion, however, is any mention of the cases it had cited in Kusilek to show that it and other courts had upheld hypotheticals limiting a claimant to "simple" or similar types of work.

Craft v. Astrue, 539 F.3d 668, decided after Kusilek and cited by the panel in Stewart, does not explain this omission.  In Craft, the administrative law judge's residual functional capacity and corresponding hypothetical to the vocational expert purported to account for plaintiff's mental limitations resulting from dysthymic disorder by including a limitation to "simple, unskilled tasks."  Finding the administrative law judge's mental RFC analysis

38

"troubling in several respects," the court first cited without comment the following passage

from Social Security Regulation SSR 85-15:

> Because response to the demands of work is highly individualized, the skill
> level of a position is not necessarily related to the difficulty an individual will
> have in meeting the demands of the job. A claimant's condition may make
> performance of an unskilled job as difficult as an objectively more demanding
> job.

Id. at 677.  It then distinguished the RFC before it from the one at issue in Johansen, 314

F.3d at 289, wherein the administrative law judge had adopted a medical expert's opinion

that the claimant could engage in "repetitive, low-stress work."  Id.  In contrast to the RFC

in Johansen, said the court, which "reflected some work requirements that were relevant to

mental abilities (i.e, repetition and stress)," the RFC in Craft's case was "for 'unskilled' work,

which by itself does not provide any information about Craft's mental condition or abilities."

Id.  The court continued:

> The Social Security Administration has stated that where the claimant has the
> ability to understand, carry out, and remember simple instructions; respond
> appropriately to supervision, coworkers, and usual work situations; and deal
> with changes in a routine work setting, then an RFC of 'unskilled' work would
> be appropriate.
>
> Here, the use of the term "unskilled" is unhelpful because we cannot discern
> whether the ALJ actually found Craft to have those abilities.

Id.  (citing 20 C.F.R. § 404.1545(c), SSR 85-15).  The court went on to explain that the

administrative law judge had merely recited information contained in Craft's medical

records, failed to mention at least one medical opinion and, with a few exceptions, had not explained the weight she was giving to the other medical opinions.  Id.  Accordingly, the administrative law judge had failed to build an "'accurate and logical bridge' between [her] recitation of the mental medical evidence and the decision to account for Craft's mental impairments by limiting him to unskilled work."  Id. at 677-78.

In Stewart, 561 F.3d at 685, the panel suggested that Craft stood for the proposition that limiting a hypothetical "to simple, unskilled work does not account for [a] claimant's difficulty with memory, concentration or mood swings."  I do not read Craft so broadly.  As in its prior cases addressing challenges to the adequacy of a mental RFC assessment, the court did not specify a formula for setting forth a claimant's mental limitations.  True, the court was critical of the administrative law judge's use of the term "unskilled," but nothing in the decision suggests that the court found that a limitation to "unskilled" or "simple" work can *never* be sufficient to reflect a person's mental limitations.  To the contrary, the court indicated that "where the claimant has the ability to understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting, *then an RFC of 'unskilled' work would be appropriate*."  Craft, 539 F.3d at 677(emphasis added).  As I read Craft, the flaw that led to remand was not that the administrative law judge erred by using the term "unskilled" as a shorthand way to capture plaintiff's mental abilities, but rather that she had failed to

40

make clear in her decision whether she had found Craft to possess the abilities required of unskilled work.

So what to make of <u>Stewart</u>?  The court's one-sided view of the law concerning the phrasing of hypotheticals in cases involving mental limitations may be attributable to the lackluster efforts of the commissioner's lawyers, who apparently failed to bring any contrary authority to the court's attention.  <u>Stewart</u>, 561 F.3d at 685 ("the Commissioner does not acknowledge these authorities or cite any contrary precedent").  Further, the case was before the court for the first time on appeal from the district court's denial of attorney fees, so the court may not have conducted the detailed review that it otherwise would have had the case been before it on the merits of the plaintiff's disability application.  Given these two factors, I am hesitant to afford much weight to <u>Stewart</u>'s sweeping rejection of RFC assessments limiting a claimant to "simple" or "unskilled" work.  Instead, I look for guidance to <u>Craft</u> and the commissioner's rulings, from which two rules emerge:  1) before finding that a claimant with a severe mental impairment is capable of performing unskilled work, the administrative law judge must conduct an individualized assessment and consider whether the claimant has the ability to understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting; and 2) the administrative law judge must explain how the evidence supports his conclusion that the claimant is capable of performing these activities.

41

3.  Administrative law judge's assessment of plaintiff's residual functional capacity

The administrative law judge in this case followed these rules.  The relevant portion

of the decision reads as follows:

> Examining psychologist Mark Bjerke, Ph. D., stated that the claimant is able
> to understand, remember, and carry out instructions on the job.  He believed
> the claimant's personality and drug issues would stand as substantial barriers
> to solid working relationships with supervisors and coworkers.   While the
> undersigned has placed some weight on Dr. Bjerke's opinion, the undersigned
> does not interpret Dr. Bjerke's statements to mean that the claimant is unable
> to work, simply that he is likely to have difficulty with supervisors and
> coworkers.   The undersigned included a limitation on interaction with
> coworkers, supervisors, and the general public based in part on this evidence.
>
> Richard Fuhrer, Ph.D., stated in June of 2005 that the claimant is able to
> understand, remember and carry out simple instructions.  Dr. Fuhrer noted
> that the claimant's ability to respond to his supervisors is likely to be poor.
> He also believed the claimant was impaired in his ability to maintain
> concentration, attention and work place pace and withstand routine work
> stress.  The undersigned does not interpret Dr. Fuhrer's statements to mean
> that the claimant is unable to do these things, merely that he will have
> difficulty doing them.  When considered in its entirety, the evidence of record
> supports no more than moderate limitations in these areas.  Based in part on
> Dr. Fuhrer's opinion, the undersigned [is] including limitations in the residual
> functional capacity including a restriction to unskilled work and a limitation
> on his interactions with others, including supervisors.

AR 30.

From this discussion, it is plain that the administrative law judge considered each of

the requirements of unskilled work and determined that plaintiff had the ability to perform

them, provided he was limited in his interactions with others.  As the administrative law

42

judge noted, both Fuhrer and Bjerke and explicitly discussed these abilities in their reports. Both found plaintiff capable of understanding, remembering and carrying out simple instructions. Fuhrer found that plaintiff had an adequate ability to adapt to changes and that his ability to withstand routine work stress "may" be impaired. Both psychologists found that plaintiff's greatest difficulty lay in his ability to respond to supervisors and coworkers, although neither said that plaintiff was so limited in this area as to be unable to work. Faced with these somewhat equivocal opinions, the administrative law judge reasonably interpreted them to mean not that plaintiff was incapable of performing the various activities required of unskilled work, but merely that he would have difficulty performing them.

Plaintiff's insistence that the RFC had to include an additional limitation related to concentration, persistence or pace is unpersuasive. "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R., Part 404, Subpt. P., App. 1, 12.00 C. 3. The commissioner defines unskilled work as work that requires little or no judgment and involves only simple tasks, which can be learned in a short period of time. 20 C.F.R. § 416.968(a). Although Fuhrer thought plaintiff would be "somewhat impaired" in his ability to maintain attention, concentration and pace, both he and Bjerke found nonetheless that plaintiff was able to understand, remember and

43

*carry out* simple job instructions, suggesting that plaintiff's limitations in this area were mild and would not interfere with his ability to perform unskilled work. Further, as the administrative law judge noted, Kanz's testing showed that plaintiff had a normal attention span and a normal ability to calculate and recall information. Morgan's testing produced similar results, finding that plaintiff had only a mild memory impairment and had average scores on tests measuring complex attentional functions and processing speed. Finally, to the extent plaintiff complained of forgetting past events, Kanz's opinion indicated that plaintiff's memory lapses were likely related to his marijuana use, not his mental impairments. In light of this evidence, it seems that the administrative law judge was being rather generous in rating plaintiff's difficulties in the area of concentration, persistence and pace as "moderate." Overall, I am satisfied that the administrative law judge gave adequate consideration to plaintiff's concentrational limitations and built an accurate and logical bridge to his conclusion that plaintiff's deficits in this area would not prevent him from performing unskilled work. Further, none of the jobs identified by the vocational expert appear to require a high degree of concentration or production, so any failure by the administrative law judge in this regard is harmless. Donahue v. Barnhart, 279 F.3d 441, 444 (7th Cir. 2002) (remand not required for ALJ's failure to include plaintiff's shortcomings in concentration in hypothetical where vocational expert did not name jobs requiring steady concentration).

44

Similarly, the administrative law judge did not err in failing to include an additional limitation concerning stress.  Plaintiff draws support for his argument from Social Security Ruling 85-15, which describes the importance of determining whether a mentally impaired individual will be able to adopt to the demands of the workplace.  The regulation explains:

> The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day. A person may become panicked and develop palpitations, shortness of breath, or feel faint while riding in an elevator; another may experience terror and begin to hallucinate when approached by a stranger asking a question. Thus, the mentally impaired may have difficulty meeting the requirement of even so-called "low stress" jobs.

> Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job . . . Any impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment.

Plaintiff interprets this ruling to mean that a limitation to unskilled work is never enough to account for a claimant's difficulties in responding to stress, but that is not what the ruling says.  Rather, it says that a limitation to unskilled work *may* not always be sufficient to account for a claimant's work-related mental limitations, and that each case must be assessed individually to determine what, if anything, might cause a problem for the claimant in the workplace.  Stated differently, the ruling indicates that an administrative law judge cannot

45

assume that a person with a severe but less-than-listing-level mental impairment can perform unskilled or "low stress" work, but must determine specifically what it is about work that is stressful for the person in order to determine whether he or she can perform jobs existing in the regional economy.

In this case, the administrative law judge undertook that individualized assessment and formulated a residual functional capacity that accounted for what plaintiff and the evaluating sources indicated would be his primary stressor at work:  interacting with other people, including supervisors.  Plaintiff has not proposed any other type of restriction that the administrative law judge ought to have included to reflect plaintiff's "response to the demands of work."  He cites Kanz's report, but Kanz said only that plaintiff's symptoms were likely exacerbated by stress.  He did not specify what was stressful to plaintiff or suggest that plaintiff could not handle the routine stress of unskilled work.  The administrative law judge's conclusion that plaintiff could handle the stress of unskilled work if he was limited in his interactions with others is reasonably supported by the evidence, most notably the fact that plaintiff was able to work without difficulty as a stock clerk for approximately three months.  20 C.F.R, Part 404, Subpt. P, App. 1, 12.00 D.3. ("Information concerning your behavior during any attempt to work and the circumstances surrounding termination of your work effort are particularly useful in determining your ability or inability to function in a work setting.").

46

In sum, I find that the administrative law judge properly considered the abilities necessary for the performance of unskilled work and explained why he found that, in spite of plaintiff's moderate limitations in handling stress, interacting with others and maintaining concentration, persistence and pace, he still could perform unskilled work provided he had no more than brief and superficial contact with co-workers and supervisors and only minimal and incidental contact with the public.  Of all the various professionals who evaluated plaintiff, not one offered the unequivocal opinion that plaintiff's mental limitations would prevent him from working.  Faced with these various opinions, none of which was entitled to controlling weight, it was up to the administrative law judge to consider and weigh their findings against each other and the other evidence in the record.  This other evidence showed that plaintiff had been able to work successfully in spite of his significant limitations, had not required psychiatric care, maintained a good relationship with his wife and functioned well enough to handle the demands of caring for his infant daughter and maintaining his household.   Reasonable minds would find this evidence sufficient to support the administrative law judge's conclusion that plaintiff can perform unskilled work not requiring significant interaction with others.  When, as here, there is a "zone of choice within which the decisionmakers can go either way," the substantial evidence standard requires this court to affirm the commissioner's decision.  Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (quoting Baker v. Heckler, 730 F.2d 1147, 1150 (8th Cir. 1984)).

47

C.  Step Five

Plaintiff contends that the vocational expert's testimony does not constitute substantial evidence that plaintiff can perform work existing in the regional economy.  First, plaintiff repeats his argument that the vocational expert testified that no work was available for a person who had all of the "moderate" and "marked" limitations identified by the state agency psychologist on the "summary conclusions" portion of the mental RFC form.  I have already rejected this argument on the ground that it relies on a misstatement of the record. The vocational expert offered no such testimony.  As noted previously, the vocational expert testified merely that the individual had to have *some* ability to perform each of the work-related functions itemized on the form.  A "moderate" or even "marked" limitation implies just that.  Cf. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 12.00(c) (defining "marked" as "more than moderate but less than extreme").

Second, plaintiff argues that the administrative law judge failed to follow Social Security Ruling 00-4p.  The commissioner can meet his burden at step five by relying on information contained in the Dictionary of Occupational Titles, which is published by the Department of Labor and gives detailed physical requirements for a variety of jobs.  SSR 00-4p; see also 20 C.F.R. § 416.966(d)(1) (Social Security Administration has taken administrative notice of the Dictionary).  Alternatively, the administrative law judge can rely on testimony from the vocational expert.  20 C.F.R. § 416.966(e); SSR 00-4p.  When, as in

48

this case, an administrative law judge takes testimony from a vocational expert about the requirements of a particular job, SSR 00-4p requires him to ask whether that testimony conflicts with the <u>Dictionary</u>.  If there is an *apparent* unresolved conflict, the administrative law judge must obtain a reasonable explanation from the expert for the conflict.   20 C.F.R. § 416.966(e); SSR 00-4p; <u>Overman v. Astrue</u>, 546 F. 3d 456, 463 (7th Cir. 2008); <u>Prochaska</u>, 454 F.3d at 735.

In this case, relying on the vocational expert's testimony, the administrative law judge found that plaintiff could perform jobs as cleaner, general farm worker and store laborer. The expert testified that his testimony was consistent with the <u>Dictionary</u> and plaintiff did not cross-examine him about the level of interaction with supervisors that was required in the identified jobs.   Now plaintiff argues that there is a conflict between the expert's testimony and the <u>Dictionary</u> because the identified jobs of cleaner (DOT #381.687-014), general farm worker (DOT #421.687-010), and store laborer (DOT # 922.687-058) require interaction with supervisors, insofar as the fifth digit of "8" in the <u>Dictionary</u> numbers indicates that the job requires taking instruction and dealing directly with a supervisor. Further, he contends that the administrative law judge did not give a reasonable explanation for the apparent conflict.

In cases like this one, where plaintiff failed to identify a conflict at the time of the hearing, plaintiff now must show that "the conflicts were obvious enough that the ALJ

should have picked up on them without any assistance."  Overman, 546 F.3d at 463.

Plaintiff argues that it is reasonable to assume that all these jobs require interaction with

supervisors on more than a brief and superficial basis, but his argument is supported by

nothing but his own conclusory assertion.  "Taking instruction and dealing directly with

supervisors" is not necessarily inconsistent with interacting with a supervisor on a brief and

superficial basis.  I am not persuaded that there was an obvious conflict between the

testimony of the vocational expert and the Dictionary of Occupational Titles.

Because there was no obvious conflict between the expert's testimony and the

Dictionary, the administrative law judge did not have any affirmative duty to make further

inquiries of the expert.  I am satisfied that the administrative law judge met his responsibility

under SSR 00-4p and properly relied on the vocational expert's testimony.

ORDER

IT IS ORDERED that the decision of defendant Michael J. Astrue, Commissioner of

Social Security, is AFFIRMED and plaintiff Gregory M. Jaskowiak's appeal is DISMISSED.

The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered this 6th day of August, 2009.

BY THE COURT:

/s/

BARBARA B. CRABB
District Judge

51